# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In the Matter of a Member of the Bar | ) | No. 143, 2016 |
| of the Supreme Court of the State of | ) | |
| Delaware | ) | Board Case No. 112424-B |
| | ) | |
| **ADAM D. GELOF,** | ) | |
| Respondent. | ) | |

Submitted: June 8, 2016
Decided: June 10, 2016

Before **HOLLAND**, **VALIHURA**, and **VAUGHN**, Justices.

*PER CURIAM:*

This 10ᵗʰ day of June, 2016, it appears to the Court that the Board on Professional Responsibility has filed a Report on this matter pursuant to Rule 9(d) of the Delaware Lawyers' Rules of Disciplinary Procedure. The Office of Disciplinary Counsel filed no objections to the Report. Respondent, through counsel, filed objections which this Court has considered. The Office of Disciplinary Counsel responded to Respondent's objections. Oral argument was held on June 8, 2016.

This Court has reviewed the matter pursuant to Rule 9(e) of the Delaware Lawyer's Rules of Disciplinary Procedure and concludes that the Board's Report should be approved.

NOW, THEREFORE, IT IS ORDERED that the Report filed by the Board on Professional Responsibility on March 23, 2016 (Exhibit A attached) is hereby APPROVED.

The Court hereby imposes a suspension of 30 days, beginning July 1, 2016. The Office of Disciplinary Counsel is directed to file within ten days of the date of this Order the costs of the disciplinary proceedings. Thereafter, Respondent is directed to have all costs paid within thirty days. The Office of Disciplinary Counsel is directed to disseminate this Order in accordance with the Rules of the Board on Professional Responsibility.

# EXHIBIT A

# BOARD ON PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF DELAWARE

In the Matter of a Member of the Bar )
of the Supreme Court of the State of )    Board Case No. 112424-B
Delaware )
                         )
**ADAM D. GELOF,** )
    Respondent. )

## BOARD REPORT AND RECOMMENDATION

This is the report of the Board on Professional Responsibility of the Supreme Court of the State of Delaware (the "Board") setting forth its findings and recommendations in the above captioned matter.

The members of the panel of the Board (the "Panel") are Theresa V. Brown-Edwards, Esquire, Earle C. Dempsey and Lisa A. Schmidt, Esquire (the "Chairperson"). The Office of Disciplinary Counsel (the "ODC") was represented by Jennifer-Kate Aaronson, Esquire. The Respondent Adam D. Gelof, Esquire (the "Respondent") was represented by Charles Slanina, Esquire.

## I. PROCEDURAL BACKGROUND.

The ODC filed a Petition for Discipline on August 15, 2015 (the "Petition"). The Petition alleged violations of Delaware Lawyers' Rules of Professional Conduct Rule 3.5(d) which states, "a lawyer shall not...engage in undignified or discourteous conduct that is degrading to a tribunal," and Rule 8.4(d) which states, "[i]t is professional misconduct for a lawyer to engage in conduct that is prejudicial to the

RLF1 14159235v.1

administration of justice." Both counts of the Petition were admitted by Respondent in his answer filed on August 25, 2015 (the "Answer"). A hearing was held before the Panel on November 23, 2015. Post hearing memoranda were requested by the Panel and submitted on January 22, 2016.

Testimony and evidence was offered by the parties to provide a factual basis for a finding of violations of Rules 3.5(d) and 8.4(d) and to assist the Board in recommending an appropriate sanction.

## II. FINDINGS OF FACT

Respondent has been a member of the bar of the Supreme Court of Delaware since 1995. (Petition and Answer ¶ 1). He has been employed for approximately 20 years as a Deputy Attorney General ("DAG") with the Sussex County Department of Justice ("DOJ"), with the majority of his career spent in the felony trial unit. (Tr. 63-64). During his career, Respondent has tried more than 60 jury trials, including capital murder cases and other high profile felony cases. (Tr. 65-66). Respondent had previously been designated the Sussex County DOJ "gun deputy" responsible for the prosecution of high profile, serious violent felony cases involving firearms. (Tr. 65-66). Respondent was described by a co-worker as "tenacious, diligent and hardworking" and that "his devotion to the case and getting the job done are extraordinary." (Tr. 111). Respondent has no prior disciplinary record. (Tr. 222).

2

On February 4, 2015, Respondent was at work in the Sussex County Courthouse handling 16 criminal case reviews on a split calendar balanced between two courtrooms. (Tr. 211-212).[1] This was a final case review day and described as one of the most stressful days for DAG's. (Tr. 116). Respondent's predominate workspace when not in a courtroom was a small witness room ("DOJ room")[2] between the two courtrooms. (Tr. 32, 82). Respondent was using the DOJ room that day along with co-workers -- Laurel Braunstein, a DOJ social worker, DAG Melanie C. Withers, Esquire, DAG David Hume IV, Esquire, DAG Casey Lynne Ewart, Esquire and DAG John W. Donahue IV, Esquire. (Tr. 10).

Respondent and Donahue have a close personal and professional relationship going back to when Donahue was assigned to the Sussex office in 2004. (Tr. 122). That relationship included relying on each other for trial advice in difficult felony cases, friendship outside the work place and periodically included kidding with each other to relieve workplace stress. (Tr. 181-184). The DAG's in Sussex County were

---

[1] Final criminal case reviews are attended by the assigned DAG, defense attorney and defendant. (Tr. 31-32). There were fifty-seven (57) criminal case reviews on the Superior Court's calendar on February 4, 2015. (Tr. 30). In addition to Courtroom 1, criminal case reviews were also being held in Courtroom 2, which is also on the second floor of the Courthouse. (Tr. 30-31). Judge T. Henley Graves was presiding over a hearing in Courtroom 4 on the first floor at the time of the incident as well. (Tr. 29).

[2] Karen Taylor, the deputy court administrator for the Superior Court in Sussex County testified that the DOJ room is 10 feet by 11½ feet. (Tr. 32).

RLF1 14159235v.1

described as a "band of brothers" who sometimes tease or "torture" each other to relieve stress. (Tr. 118). On this day there was a sense that Respondent was having a particularly bad day based upon the assigned work load and his colleagues viewed this as an opportunity to torture him. (Tr. 117-118,137-138).

At around 10:00 am that day, Respondent briefly exited the DOJ room. Donahue was aware that Respondent had an aversion to the smell of hard boiled eggs (causing him to gag) which had been the source of previous back and forth jokes. (Tr. 183-184, 119). Respondent's co-workers saw that Respondent was particularly stressed so they encouraged Donahue to continue the "hardboiled egg feud." (Tr. 119). Donahue made a point to eat the eggs over a box of Respondent's files as part of the running joke. (Tr. 67-68, 117-119). Upon Respondent's return to the DOJ room, he observed Donahue eating an egg over his files with additional eggs sitting in his box of files. (Tr. 67-68). Respondent had a predictable adverse reaction which led to laughter by everyone including Respondent in the DOJ room.[3] (Tr. 119).

Respondent left the DOJ room laughing and immediately ran into Delbert Garrison ("Garrison"), Chief of Security of the Superior Court in and for Sussex County in the hallway outside the DOJ room. (Jt Ex. 1 (Video 10:24:12)). Without

---

[3] At that time, Detective Jon B. King ("Det. King") was not in the DOJ room.

4

any evidence of pre-planning or thought, (Tr. 78-79), Respondent asked Garrison to go into the witness room with "guns drawn" and tell Donahue to "keep the eggs away from his files" (Jt. Ex. 10 at 5-6; Tr. 68). Garrison initially refused stating, "yeah that's not going to happen." (Tr. 68). Respondent persisted trying to get Garrison to go in the room and "mess with Donahue." (Tr. 68 -70). Respondent opened his wallet and offered Garrison $20. (Jt. Ex. 1; Jt. Ex. 10 at 6; Tr. 69). Garrison repeatedly declined stating, "We're not doing that, keep your money." (Tr. 69; Jt. Ex. 10 at 7,16)[4] When Garrison walked away, Respondent followed him into the bailiff's office. (Tr. 69). Garrison finally agreed. (Jt. Ex. 10 at 7-8).[5] As Respondent and Garrison exited the Bailiff's Office, Respondent told Garrison: "Remember, guns [*sic*] drawn." (*Id.* at 16). The complete interchange between Respondent and Garrison prior to the incident took 40 seconds in its entirety. (Jt. Ex. 1 (Video 10:24:28 to 10:25:08)).

Respondent then went to Courtroom 1, where the Honorable M. Jane Brady was presiding over final case reviews. (Jt. Ex. 1 (photo)). Garrison walked back

---

[4] Garrison did not testify at the Hearing.

[5] According to Garrison, Respondent then offered the $20 to "Tony" (Charles A. Summers, Jr., a Superior Court bailiff). (Jt. Ex. 10 at 7-8). Summers's contradictory testimony was not provided to the Panel at the Hearing. The ODC elicited hearsay testimony from Ms. Taylor regarding Mr. Summers's involvement. (Tr. 50). Respondent's request to strike that testimony is granted. The Panel does not believe the facts surrounding Summers are germane to its analysis.

5

toward the DOJ room. Just before the door to the DOJ room came into Garrison's view (Jt. Ex. 1(Video 10:25:12 to 10:25:17)), Det. King opened the door and entered the DOJ witness room and moved to a position which was behind the door when opened.[6]

Garrison entered the DOJ room, drew his firearm[7] and pointed it toward Donahue stating: "Gelof says keep the eggs away from the files." Immediately people in the room started laughing. (Tr. 17, 120, 125, 126, 185; Jt. Ex. 10 at 10). Det. King was jammed in the corner behind where the door swings open and was only able to see the black semi-automatic handgun and a hand come past the edge of the door. (Tr. 12). In his position behind the door, Det. King was not able to see that the individual in question was a bailiff and was unable to see the reaction of the majority of people in the room. He did not hear Garrison say, "Gelof says keep your eggs out of his files." (Tr. 11-12). There was a split second in which Det. King perceived a threat, but it occurred so quickly that before he could reach for his weapon or react, he heard a chuckle from the people in the room and Garrison backed out of the room and the door closed. (Tr. 12).

---

[6] ODC and Respondent agree the individual seen entering the room is in fact Det. King.

[7] Garrison stated that his automatic weapon had a loaded clip but was not loaded with a live round in the chamber. (Jt. Ex. 10 at 8-10.) Garrison stated that without his finger on the trigger and without a round in the chamber he believed his conduct in the prank was fully safe. (Jt Ex. 10 at 8- 9, 12).

6

The people in the DOJ room understood that Garrison's actions were a prank. Det. King testified, "Yes, I think at some point, I don't recall who, but someone said it was the bailiff and there was some type of joke going on." (Tr. 18). Garrison, indicated in his statement there was an immediate "big laugh" multiple times. (Jt. Ex. 10 at 10). "I heard laughing everywhere." (Jt. Ex. 10 at 15). Donahue testified, "And you know, people started laughing. He said something along the lines of Adam said get those damn eggs out of here... but people started laughing." (Tr. 185). Withers: "I interpreted it immediately as a joke... I was laughing." (Tr. 125). Hume: "I realized it was a joke immediately." (Tr. 170). "I've known Mr. Garrison for quite some time. I knew he is the chief bailiff in the Superior, or was at that time, I knew he wouldn't do anything to harm any of us. So, when Garrison said it and the way he said it, I took it as a joke." (Tr. 171). "He mentioned the eggs that Mr. Donahue had, so I knew what that was in reference to. I knew that had been a running joke for some time." (Tr. 171).

Shortly after the incident, Garrison walked to Courtroom 1 and got Respondent's attention. Garrison is seen giving Respondent a "thumbs up" across the courtroom and Respondent looks up and exchanges the gesture. (Jt. Ex. 1 (Video and photo)). At some point after completing his final case review in Courtroom 1, Respondent learned partial details of what occurred and despite having made the

7

request of Garrison did not immediately believe what had transpired. (Tr. 219).

Withers testified that when she told Respondent shortly thereafter, "dude, that wasn't cool," he (Respondent) sat down and "the expression on his face told me he had no idea what I was talking about. He really didn't understand what had just happened." (Tr. 120-121).

The following morning, February 5, 2015, Det. King emailed Karen Taylor, Deputy Court Administrator for the Superior Court in and for Sussex County to inform the Court about the incident. (Jt. Ex 2).[8] Taylor forwarded the email to the Honorable Judge Richard F. Stokes and was summoned to the courthouse for a meeting. (Tr. 33-34). Taylor and Judge Stokes then met with Garrison at which time Garrison was relieved of his firearm. (Tr. 34-36; Jt. Ex. 4). President Judge Jan R. Jurden and Linda Carmichael, Superior Court Staff Attorney, were notified. (Tr.

---

[8] In the email to Taylor, Det. King stated, in part:

This obviously alarmed me and I began to react by attempting to get to my weapon. Before I drew my weapon there was a chuckle in the room and the door closed. I immediately questioned who that was and was told it was Dell [sic] the bailiff. Apparently he was playing a joke. My concern is that had I been in a different position to draw my weapon it is quite possible I would have fired my weapon in light of the threat I perceived or had it been a second longer I may have decided to wrestle the gun from this person. My intent is to make someone aware because I feel that the action demonstrated extremely poor judgment with regards to the handling of a firearm in the courthouse. (Jt. Ex. 2).

8

37-38). Peggy Marshall, the Sussex County Chief Prosecutor, was contacted. (Tr. 38). Capitol Police were asked to conduct a criminal investigation. On February 6, 2015, Garrison was placed on administrative leave and escorted from the Courthouse. (Tr. 38-39).

On February 9, 2015, Administrative Order 2015-1 was issued by President Judge Jurden. (Jt. Ex. 8). The Administrative Order was intended to be an internal document[9] but was mistakenly published on Superior Court's website and then reported by the press. (Jt. Exs. 6, 7). Respondent was named in that account and acknowledged that he "involved a bailiff in a practical joke" and was "professionally and personally embarrassed for all involved that my actions have resulted in the matter going this far." (Jt. Ex. 6).

On Friday February 13, 2015, at 4:30 pm, Respondent was informed he was indefinitely suspended. His badge and keys were removed and he was escorted out of the Department of Justice building. (Tr. 216).

In early March 2015, Garrison returned to work with similar job responsibilities, but was demoted from Chief of Security to a Court Security I with a corresponding reduction in pay. (Tr. 42-43). Garrison appealed the employment

---

[9] The Administrative Order was withdrawn from the website due to security concerns. (Tr. 46-47).

RLF1 14159235v.1

decision. By letter dated June 4, 2015, by Stephanie Fitzgerald, the Court of Common Pleas Administrator, upheld the employment decision. (Jt. Ex. 5).

After the Capitol Police investigation, the matter was presented to the Department of Justice for criminal review and it was determined criminal charges were not warranted. On or about April 27, 2015, Respondent was approved to return to work. He served a 2 month paid suspension (effectively prohibiting his practice of law). Respondent was demoted from a DAG Level 5, Unit Head 2 to a DAG Level 3, an entry level position he last held 18 years earlier in 1997. (Tr. 92). His return at Level 3 (a 12 step demotion) carried a more than 20% pay cut. (Tr. 92, 217). Respondent was "put on a probationary period of a year." He was not allowed to prosecute felony cases, which is what he has been doing since 1998, until it was approved by the Chief Deputy, Respondent's Court Supervisor and the Attorney General himself. Respondent also was put on a performance improvement plan and was subject to review periods. (Tr. 93). Respondent took full responsibility for what occurred[10] and accepted these consequences.

Considerable resources were expended on this matter. Attending meetings, conference calls and hearings, Taylor's time alone in responding to this incident was in excess of 50 hours. (Tr. 52). In addition, during Garrison's suspension, Taylor

---

[10] Respondent testified: "I mean I will be the first to say it, if it weren't for me, Del wouldn't have done this." (Tr. at 90).

RLF1 14159235v.1

assumed Garrison's responsibilities as Chief of Security in addition to her own administrative duties for approximately five (5) months. (Tr. 41-42, 52). In executing her duties as Chief of Security, Taylor worked approximately 70-75 hours of uncompensated overtime. (Tr. 52).

The Delaware Capitol Police conducted eleven (11) interviews, obtained courthouse surveillance and briefed Dennis Kelleher, Esquire, the DAG responsible for determining whether criminal charges would be filed. (Jt. Ex. 3; Tr. 45). Capitol Police expended 85 – 90 hours on their investigation. (Tr. 53).

## III. THE PRESUMPTIVE SANCTION

Attorney discipline is not intended to be punitive. *In re Koyste,* 111 A.3d 581 (Del. 2015). Rather, the objectives of the Lawyer Disciplinary System are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar conduct. *In re Fountain,* 878 A.2d 1167, 1173 (Del. 2005). To "further these objectives and 'to promote consistency and predictability in the imposition of disciplinary sanctions,'" the Supreme Court looks for guidance to the ABA Standards for Imposing Lawyer Sanctions ("ABA Standards"). *See id.* (citation omitted).

11

## A.   ABA STANDARDS

In formulating an appropriate sanction, the Court is generally guided by the ABA Standards and to relevant Delaware precedent when making an initial determination of an appropriate or presumptive sanction after finding attorney misconduct. The ABA Standards set out a four-factor test: (1) the ethical duty violated; (2) the lawyer's mental state; (3) the extent of the actual or potential injury caused by the lawyer's misconduct; and (4) aggravating and mitigating factors. *In re Lassen*, 672 A.2d 988, 998 (Del. 1996). The first three factors lead to a preliminary determination of the appropriate sanction. The fourth factor – relevant aggravating and mitigating circumstances – may be considered in determining whether an increase or decrease in the presumptive sanction is warranted. ABA Standard 3.0.

### 1.   Duties Owed to the Legal System and the Legal Profession

Violations of Rules 3.5(d) and 8.4(d) involve breaches of duties owed to the legal system and the legal profession. *In re Murray*, 2012 WL 2324172 at *30 (Del. June 18, 2012). None of the ABA Standards specifically address the type of conduct at issue here. The ODC relies on ABA Standards 6.22, 6.32 and 7.2. ABA Standard 6.22 addresses abuse of the legal process through violation of a court order or rule. ABA Standard 6.32 deals with improper communications with individuals in the legal system and addresses interference with the outcome of a legal proceeding.

12

Finally, ABA Standard 7.2 addresses breaches of a legal duty owed to the profession and "conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to...the public, or the legal system."

Respondent argues that none of the ABA Standards cited by the ODC are applicable to the Respondent's conduct. The Panel agrees that while ABA Standard 7.2 most closely fits the conduct here, none of the cited standards specifically apply. Instead, the Panel has analyzed the conduct under ABA Standard 5.2 which deals with a "failure to maintain the public trust" and "cases involving public officials who engage in conduct that is prejudicial to the administration of justice." Under ABA Standard 5.2, discipline is imposed if the conduct "causes injury or potential injury to a party or to the integrity of the legal process." ABA Standard 5.2.

The Delaware Supreme Court "takes very seriously a lawyer's fundamental duty to foster public confidence in our Bar and to maintain the integrity of the legal profession." *In re Howard,* 765 A.2d 39, 46 (Del. 2000). Respondent admitted his conduct in the courthouse was undignified, discourteous and was prejudicial to the administration of justice. (Tr. 66). Respondent acknowledged that his actions affected the integrity of the Office of the Attorney General, explaining, "it's like what kind of prosecutors are you hiring that someone thinks it's funny to play with guns in the courthouse." (Tr. 85-86). The Panel appreciates the Respondent's

13

candor and acceptance of responsibility, but must conclude that Respondent's actions breached the duties he owed to the Court, the legal system and the profession.

## 2. Respondent Acted Intentionally, Knowingly and Recklessly

Respondent acted intentionally knowingly and recklessly when he persistently requested Garrison brandish his firearm in the Courthouse despite Garrison's initial refusal to do so. (Tr. 69). Intent is the "conscious objective or purpose to accomplish a particular result." ABA Standards, Definitions. Respondent engaged Garrison in an ill-conceived prank in the Courthouse. Respondent's intent was to make people laugh. (Tr. 71).

"'Knowledge' is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards, Definitions. Respondent's request to Garrison was specific: go in the interview room, pull a gun and tell Donahue to get the eggs out of the office. (Tr. at 68, 70). Respondent pursued Garrison until Garrison agreed. (Tr. 69).

Respondent was a seasoned prosecutor and former "gun deputy" and should have been aware of the potential risks of pointing a loaded firearm at an individual in a courthouse, particularly in a climate where the security of the public, judges, court

14

personnel and lawyers has been an issue following a fatal shooting in the New Castle County Courthouse in 2013. Respondent's disregard of the risk of harm to others was reckless.

### 3. Respondent's Misconduct Caused Potential Injury

"'Injury' is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." ABA Standards, Definitions. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." ABA Standards Definitions. Respondent admits his conduct was embarrassing and degrading to the Court, the DOJ and the profession and resulted in a waste of resources by the Court (Tr. 84-86, 218-219). *See, In re Vanderslice*, 116 A.3d 1244, 2015 WL 3858865 at *12 (Del. 2015) (Lawyer's misconduct caused actual harm -- "an exorbitant waste of judicial resources").

"'Potential injury' is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards Definitions. Had Det. King not been pinned behind the DOJ interview room door and unable to reach his firearm when Garrison pointed his loaded semi-automatic weapon at Donahue, the potential harm

15

resulting from Respondent's solicitation of Garrison could have been fatal. Respondent created a dangerous situation and placed his colleagues and others at risk for injury or even death. (Tr. at 71).

## IV.   ANALYSIS

In applying ABA Standard 5.2[11] to the facts of this matter, the Panel concludes that the presumptive sanction is suspension where Respondent's actions "caused injury or potential injury to a party or to the integrity of the legal process."

While the Delaware Supreme Court is significantly guided by prior Delaware disciplinary decisions, the Panel has found the current situation to be unprecedented. Both the ODC and Respondent have pointed the Panel to *In re Schaeffer*, 2012 WL 1859887 (Del. May 21, 2012). Schaeffer was involved in a legal dispute with an attorney who left his firm. When that attorney returned to the law offices against instruction and in the company of others, there was a confrontation. Schaeffer reacted by calling 911, first to report an "altercation" and subsequently called to report a "hostage situation." The result of the calls was the arrival of an armed police SWAT team and the departing attorney and his staff (which included women and children) being detained at gunpoint.

---

[11] The Board notes that the presumptive sanction would be the same under ABA Standards 6.22, 6.32, or 7.2.

16

Schaeffer was found to have violated Rule 8.4(b) (criminal act), (c) (conduct involving dishonesty, fraud, deceit or misrepresentation and (d) (conduct prejudicial to the administration of justice) by falsely reporting to the police that a "hostage situation" was taking place. The panel in *Schaeffer* concluded that the appropriate sanction was a public reprimand. That sanction was approved by the Court. The panel arrived at that recommendation based on the conclusion that the presumptive sanction was suspension. In determining the appropriate sanction, the *Schaeffer* panel applied ABA Standard 5.0 dealing with violations of duties owed to the public. Specifically, the panel found Standard 5.1 to be the most applicable, which provides for sanctions in cases involving the commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases involving dishonesty, fraud, deceit or misrepresentation. The panel concluded that the presumptive sanction was suspension under Standard 5.12.

Here, there was no charge in the Petition, charges filed, nor evidence presented that Respondent's conduct criminal, Respondent's misconduct, however, occurred in a courthouse, a place where the Court and members of the public expect professionalism in the resolution of their cases before the Court. Respondent's misconduct involved the Chief of Security, the person in the Superior Court then

17

armed with a gun for the *protection* of the public. Respondent's misconduct cast a shadow over the public's perception of the DOJ, the State's chief of law enforcement agency charged with enforcement of the criminal law. Respondent's misconduct wasted more than one hundred and forty-five (145) hours of Taylor's and Capitol Police's time and resources.

While *Schaeffer* and other Delaware disciplinary decisions involving conduct degrading to a tribunal and prejudicial to the administration of justice have resulted in public reprimands, the Panel concludes that suspension is warranted here.[12] Respondent contends that the appropriate focus should be on the actual or potential injury to the party related to his charged offenses. Respondent acknowledged that the evidence of such harm to the Court presented was the substantial administrative inconvenience and that an investigation occurred. Respondent acknowledges that waste of judicial resources has been recognized as a measure of harm. *In re Vanderslice*, 116 A.3d 1244 (Del. 2015). Respondent also argues that reliance on

---

[12] *See, In re Abbott*, 925 A.2d 482 (Del. 2007)(public reprimand appropriate for undignified, discourteous and degrading statements against opposing counsel and the Court in violation of 3.5(d) and 8.4(d)); *In re Ramunno*, 625 A.2d 248 (Del. 1993)(public reprimand for violation of what is now 3.5(d), insulting and vulgar language to opposing counsel and the Court); *In re Guy*, No. 138, 1995 (Del. 1995)(public reprimand for discourteous, degrading and disrespectful remarks about the Court); and *In re Murray*, 2012 WL 2324172 (Del. June 18, 2012)(public reprimand for undignified, discourteous and degrading statements to the Court in an effort to avoid Family Court appointments).

18

potential injury to the participants and bystanders to this conduct is misplaced given that Respondent was not charged with any violations related to any risks posed to those parties. The Panel disagrees.

Respondent intentionally, knowingly and recklessly created a potentially very dangerous situation in the Sussex County Courthouse which could have resulted in injury or even death. Respondent's "practical joke" caused actual harm to the Superior Court's administration of justice by diverting the court's resources to handle the aftermath of Respondent's misconduct. Additionally, Taylor's assumption of Garrison's duties as Chief of Security required Taylor work seventy-five (75) uncompensated hours. The DOJ also expended resources in its investigation determining whether to file criminal charges and in handling Respondent's personnel matter. Finally, Respondent's colleagues were burdened with Respondent's caseload upon his suspension. (Tr. at 32).

## V. MITIGATING FACTORS

The mitigating factors proven at the Hearing include the following:

### A. Absence of a Prior Disciplinary Record

Respondent has no prior disciplinary record after over 20 years of practice, most spent in public service. (Tr. 222).

RLF1 14159235v.1

**B. Absence of a Dishonest or Selfish Motive**

This mitigating factor is inapplicable.

**C. Personal or Emotional Problems**

This mitigating factor is inapplicable. The testimony at the hearing was that Respondent was experiencing a stressful day; handling multiple, complicated and important matters; shuttling between two courtrooms (Tr. 211-214); and that he was responding to an instigating prank. Respondent and his co-worker witnesses provided uncontroverted testimony as to the stress and methods of coping with stress experienced by prosecutors. Nevertheless, Respondent did not use stress as an excuse, only an explanation for his conduct.

**D. Timely Good Faith Effort to Make Restitution or to Rectify Consequences of His Misconduct**

The record is replete with Respondent's efforts to apologize to everyone directly and remotely affected by his conduct. His efforts to apologize extended to affected members of the judiciary, and Respondent testified as to the gracious acceptance and support he received in response. Respondent has also accepted the professional consequences of his actions and completed a Performance Improvement Plan with the Department of Justice.

20

**E.     Full and Free Disclosure to the Disciplinary Board or a Cooperative Attitude Toward Proceedings**

The record reflects that Respondent admitted to both Counts of the proceeding. Respondent has fully and candidly admitted his conduct during the investigation conducted by the Department of Justice, the Court and the Office of Disciplinary Counsel. Respondent admitted again his responsibility during the hearing before the Panel. Disciplinary Counsel acknowledged that cooperation at the hearing. (Tr. 237).

**F.     Inexperience in the Practice of Law**

This mitigating factor is inapplicable.

**G.     Character and Reputation**

The uncontroverted evidence presented during the Hearing by numerous witnesses which included DAG's, Respondent's wife (and fellow member of the Bar), defense counsel, a lay person and current and former police officers clearly established his good character and excellent reputation. Respondent is highly regarded as a prosecutor and for his service in his community as the founder of a youth baseball program in Sussex County.

**H.     Physical or Mental Disability or Impairment**

Respondent did not make a claim of impairment.

RLFI 14159235v.1

## I.    Delay in Disciplinary Proceedings

Respondent consented to the rescheduling of this matter, but testified that this matter has weighed heavily on him, causing much anxiety and the Department of Justice delayed his return to his previous assignment pending the outcome of the disciplinary matter.

## J.    Interim Rehabilitation

Respondent successfully completed the Performance Improvement Plan imposed by the DOJ. (Tr. 218). Respondent also demonstrated his remorse and recognition of the wrongfulness of his conduct. (Tr. 228).

## K.    Imposition of Other Penalties or Sanctions

Respondent was suspended for two months by the DOJ. (Tr. 91). He was demoted in rank with a significant loss in pay. (Tr. 217). He was reassigned to other duties upon his return to work. Respondent had to complete a Performance Improvement Plan. (Tr. 218). Respondent was put on employment probation for a year. He was not allowed to prosecute felony cases, which he had been doing since 1998, until such time as approved by the Chief Deputy, Respondent's Court Supervisor and the Attorney General himself.

22

RLFI 14159235v.1

## L.    Remorse

Respondent offered his uncontroverted expressions of remorse and regret. Those expressions of remorse predated the hearing as Respondent and his numerous witnesses consistently testified as to his previous apologies for his conduct.

## M.    Remoteness of Prior Offenses

This Standard is inapplicable since Respondent has no prior disciplinary record.

## VI.    AGGRAVATING FACTORS

ABA Standard 9.2 sets out the factors which may be considered in aggravation. The Panel concludes that only one aggravating factor is present. ABA Standard 9.22(i) lists substantial experience in the practice of law as an aggravating factor. Respondent has been a member of the bar of the Supreme Court of Delaware since 1995 and has been employed as a DAG for nearly 20 years. Respondent had previously been designated the Sussex County DOJ "gun deputy" responsible for the prosecution of high profile, serious violent felony cases involving firearms. Although, Respondent argues that this Standard is inapplicable since the conduct occurred independent of or unrelated to the practice of law, the Panel disagrees. Respondent's experience and position in the DOJ must be taken into account.

23

## CONCLUSION

The Panel has considered the aggravating and mitigating factors. The Panel agrees that the sole aggravating factor far outweighs the numerous mitigating factors and concludes that the presumptive sanction of suspension is appropriate. Respondent's practical joke could have had very serious consequences for the individuals in the DOJ room that day as well as others in the Courthouse. However, the Panel does recognize that Respondent has taken responsibility for his actions, accepted the professional consequences and apologized to all impacted by his actions. Thus, the Panel has taken the mitigating factors into account in recommending that the Respondent should only be suspended for a period of 30 days.

RLF1 14159235v.1

_Lisa A. Schmidt_ (signature)

Lisa A. Schmidt (Bar No. 3019)

Theresa V. Brown-Edwards (Bar No. 4225)

Earle C. Dempsey

Dated: March 22, 2016

25

RLF1 14159235v.1

Lisa A. Schmidt (Bar No. 3019)

Theresa V. Brown-Edwards (Bar No. 4225)

Earle C. Dempsey

Dated: March 22, 2016

RLF1 14110376v.2

Lisa A. Schmidt (Bar No. 3019)


Theresa V. Brown-Edwards (Bar No. 4225)


Earle C. Dempsey


Dated:    March 22, 2016

25